UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Edward S. Kiel |
| | : | |
| v. | : | Mag. No. 22-15298 |
| | : | |
| JOHN SABO | : | CRIMINAL COMPLAINT |
| | : | |
| | : | **FILED UNDER SEAL** |

I, Jennifer Richardson, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Jennifer Richardson, Special Agent
Federal Bureau of Investigation

Special Agent Jennifer Richardson attested to this Complaint by telephone pursuant to F.R.C.P. 4. 1(b)(2)(A) on this 15th day of November, 2022 at 12:06pm

S/ Edward C. Kiel
_____
HONORABLE EDWARD S. KIEL
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## Counts One and Two
### (Wire Fraud)

From in or around November 2014 through in or around November 2022, in the District of New Jersey and elsewhere, defendant

## JOHN SABO

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, each constituting a separate count of this Complaint.

| Count | Approximate Date | Description |
|---|---|---|
| 1 | January 23, 2020 | Interstate wire sent through the Fedwire Funds Service related to approximately $37,000 fraudulently obtained from Victim-1 |
| 2 | December 12, 2018 | Interstate wire sent through the Fedwire Funds Service related to approximately $140,000 fraudulently obtained from Victim-2 |

In violation of Title 18, United States Code, Sections 1343 and 2.

## ATTACHMENT B

I, Jennifer Richardson, am a Special Agent with the Federal Bureau of Investigation. I have conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation and have knowledge of the following facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. All dates and dollar amounts described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

### Overview

1. From in or around November 2014 through the present, defendant JOHN SABO ("SABO") fraudulently induced victims into paying millions of dollars in fees to him through Bankers Capital LLC ("Bankers Capital"), which purported to possess highly lucrative letters of credit, credit enhancement services and access to other forms of collateral that would be used to procure millions of dollars in financing for large capital projects. SABO failed to deliver the promised collateral or financing, and instead misappropriated victim funds for his own personal gain.

### Background

2. At all times relevant to this Complaint:

   a. SABO was a resident of Spring Lake, New Jersey and/or Naples, Florida.

   b. SABO controlled and operated Bankers Capital, which was founded in or around 2012. Bankers Capital's principal place of business was SABO's residence in Spring Lake, New Jersey.

   c. "Victim-1" was a limited liability company that owned minerals used for oil production with a principal place of business in Logan, Utah.

   d. "Victim-2" was a limited liability company that developed real estate, with a principal place of business in San Diego, California.

   e. Funds sent through the Fedwire Funds Service involved electronic communications between Federal Reserve Bank facilities in New Jersey and Texas.

## The Scheme to Defraud

3.     From at least as early as in or around November 2014 through the present, SABO knowingly and intentionally devised and intended to devise a scheme and artifice to defraud Victim-1, Victim-2, and others (the "Victim Clients"), and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

## Goal of the Scheme to Defraud

4.     The goal of the scheme was for SABO to obtain money for his own personal gain by fraudulently inducing individuals and entities to pay upfront fees to Bankers Capital for services and fees that were never provided.

## Manner and Means of the Scheme to Defraud

5.     It was part of the scheme to defraud that:

   a.    SABO misrepresented to Victim Clients that Bankers Capital would provide financing collateral worth millions of dollars to secure loans for large capital projects sought by the Victim Clients, and that SABO would use upfront fees paid to him to provide financial consulting services and to secure that financing. Neither SABO nor Bankers Capital possessed or had access to the collateral that SABO promised.

   b.    In addition, instead of using the fees as SABO claimed, he diverted millions of dollars out of Bankers Capital, primarily for personal expenses. For instance, SABO used money that he collected from Victim Clients to make payments of approximately $3 million to creditors from a prior bankruptcy proceeding and approximately $1 million to his ex-wife, and he spent more than $259,000 on golf-related expenses.

   c.    To lull investors and, in some cases to induce them to pay additional fees, SABO sent frequent e-mails to the Victim Clients assuring them that he was working hard to fulfill his promises and secure financing.

   d.    Despite SABO's repeated representations, SABO failed to provide the Victim Clients with collateral and did not procure any financing for them.

Victim-1

6.     In or around January 2015, Victim-1 was seeking approximately $465 million in funding to develop testing capabilities in connection with its mineral business. In or around January 2015, SABO made a number of false

and fraudulent representations to Victim-1, including misrepresenting that Bankers Capital would obtain the desired financing and that Bankers Capital would provide a $200 million bank instrument or securities to secure the financing Victim-1 sought.

7. Specifically, in a Financial Services Funding Agreement dated on or about January 7, 2015 that was signed by Victim-1 and SABO, SABO, on behalf of Bankers Capital, falsely and fraudulently represented that:

a. "Bankers Capital…agrees to deliver a $200 million Bank Instrument or Securities as Credit Enhancement for a loan for [Victim-1]'s proposed Energy Project through their financial provider. This Letter of Credit and Loan financing will produce proceeds of approximately $160 million for [Victim-1]'s project financing (loan) whereby approximately $24 Million will be initially dedicated to the project; $103Million will be placed into an Investment Program to be used to repay the debt obligation; and $440 Million for future project costs as directed by [Victim-1] over approximately 24 months…";

b. "Bankers Capital, as consultant, will be managing the entire funding process and will be acting as manager for the issuance of the Bank Guarantee, delivery of the Bank Instrument, Investment Consultant, and the procurement of the Credit Line (loan). After the above Procedures are completed Bankers Capital will review and complete due diligence on the approval of the transaction and prepare issuance of a Funding Agreement…"; and

c. "Once the Bankers Capital Financial Services Funding Agreement has been issued and executed, a fee of $250,000 is due and payable to Bankers Capital. The fee will be kept in a special purpose account at JP Morgan Chase Bank until the primary collateral is verified along with a registration number. The fee is compensation for investment banking management, related instrument fees, finance consultant/advisory, and the procurement of non-recourse financing for [Victim-1]…."

8. These representations were false and fraudulent because neither SABO nor Bankers Capital possessed or had access to provide a $200 million instrument or equivalent securities. Moreover, instead of keeping Victim-1's fee in a "special purpose account" as promised, SABO deposited these fees – and fees paid by other Victim Clients – into a general business savings account that SABO controlled. SABO then transferred the bulk of the money deposited into that account to other accounts that he controlled, and SABO used that money primarily to pay for his personal expenditures.

9. On or about January 12, 2015, in reliance on SABO's false and fraudulent representations, Victim-1 wired SABO approximately $250,000. This wire transfer was processed through the Fedwire Funds Service and involved an

electronic communication between Federal Reserve Bank facilities in New Jersey and Texas.

10. Over the next several years, SABO frequently sent emails to Victim-1 and other victims containing false assurances that SABO was in the process of and close to securing the promised collateral and/or financing. In or around January 2020, after Victim-1 made numerous inquiries as to why the financing had still not materialized, SABO made additional false and fraudulent representations to Victim-1, including that Victim-1 needed to pay an additional $37,000 to get "priority funding." In an Amended Financial Services Funding Agreement dated on or about January 21, 2020 that was signed by Victim-1 and SABO, SABO also falsely and fraudulently represented that:

> Once the Bankers Capital Financial Services Funding Agreement has been issued and executed, a fee of $37,000 is due and payable to Bankers Capital. This fee is compensation for investment banking management, related instrument fees, finance consultant/advisory, and the procurement of nonrecourse financing for [Victim-1]. [Victim-1] is fully agreeing to pay these bank and consulting fees and is acknowledging that Bankers Capital is acting as their financial manager and consultant for this transaction....

11. On or about January 23, 2020, in reliance on SABO's false and fraudulent representations, Victim-1 wired SABO $37,000. This wire transfer was processed through the Fedwire Funds Service and involved an electronic communication between Federal Reserve Bank facilities in New Jersey and Texas.

12. Despite many follow-up inquiries, Victim-1 never received the collateral or investment consulting services that SABO promised to provide or the financing that SABO promised to procure for Victim-1, and SABO has never refunded the fees he collected from Victim-1.

<u>Victim-2</u>

13. In or around November 2018, Victim-2 was seeking approximately $23 million in funding to finance a real estate investment. In or about November and December 2018, SABO made several false and fraudulent representations to Victim-2, including misrepresenting that Bankers Capital would obtain the $23 million in financing and that Bankers Capital would provide a $40 million medium-term note ("MTN")[1] as collateral to secure the financing Victim-2 sought.

---

[1] A medium-term note is a debt note that typically matures in 5-10 years.

14.     In a Financial Services Funding Agreement dated and signed by SABO on or about December 5, 2018, SABO falsely and fraudulently represented that:

   a.     "Bankers Capital...agrees to deliver a $40Million Bank MTN as Credit Enhancement for a loan for [Victim-2's] proposed Real Estate Acquisition Projects through their financial provider....";

   b.     "Bankers Capital, as consultant, will be managing the entire funding process and will be acting as manager for the issuance of the MTN, delivery of the Bank MTN, Investment Consultant, and the procurement of the Credit Line (Loan) After the above Procedures are completed Bankers Capital will review and complete due diligence on the approval of the transaction and prepare issuance of a Funding Agreement. (Completed)...";

   c.     "Once the...Agreement has been issued and executed, a fee of $140,000 is due and payable to Bankers Capital. This service fee is being dedicated for investment banking management, related start-up collateral (MTN) service fees, finance consultant/advisory, and the procurement of financing for [Victim-2]...."; and

   d.     "Bankers Capital will arrange, through its Financing Partners, a loan to [Victim-2] in the amount of $23 million as per [Victim-2's] submitted draw schedule and approved by [Bankers Capital]...."

15.     Neither SABO nor Bankers Capital possessed or had access to a $40 million MTN or the ability to secure a $23 million loan.

16.     On or about December 12, 2018, in reliance on SABO's false and fraudulent representations, Victim-2 wired SABO $140,000. This wire transfer was processed through the Fedwire Funds Service and involved an electronic communication between Federal Reserve Bank facilities in New Jersey and Texas.

17.     SABO subsequently sent several false and fraudulent emails to Victim-2 claiming that SABO had secured the collateral and/or was making progress with the financing process. For example, on or about April 9, 2021, SABO emailed Victim-2 that Bankers Capital "has procured collateral on your behalf and our collateral is readily available for closing..." In fact, neither SABO nor Bankers Capital had ever secured any collateral on behalf of Victim-2.

18.     Separately, SABO also falsely claimed that he had access to lucrative carbon credits,[2] which he could use as collateral to help secure financing for

---

[2] Carbon credits are designed to incentivize the reduction of greenhouse gas emissions. Companies get a set number of credits to use, and they can sell any excess credits to

7

Victim-2. For example, in a Stock/Commodity Lease Agreement dated on or about July 26, 2021, SABO falsely and fraudulently represented to Victim-2 that Bankers Capital "is the record and beneficial owner of 8Million Metric Tons of Forestry Carbon Credits with an environmental value of approximately 25 million dollars…of Carbon Credits, which…constitute collateral which is being pledged on behalf of [Victim-2] by [Bankers Capital] for the purpose of [Victim-2]'s real estate project financing…" In fact, neither SABO nor Bankers Capital possessed or had access to $25 million worth of carbon credits.

19. Ultimately, despite many follow-up inquiries, Victim-2 never received the collateral or investment consulting services that SABO promised to provide or the financing that SABO promised to procure for Victim-2, and SABO has never refunded the fees he collected from Victim-2.

\*   \*   \*

20. At least approximately five additional Victim Clients each paid thousands of dollars in fees to SABO based on SABO's misrepresentations that he would provide them with collateral, consulting and financial services and procure millions of dollars in financing for their respective projects. As with Victim-1 and Victim-2, SABO failed to deliver on his promises to these Victim Clients, and instead used their fees primarily for his personal expenses.

21. SABO's scheme resulted in over $1.77 million in losses to Victim Clients.

---

another company. Thus, carbon credits create a monetary incentive for companies to reduce their carbon emissions by profiting off the sale of excess credits they do not use.